UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


Emergency Professional Services, Inc.,

    Plaintiff/ Counter- Defendant,

v.                                                          Case No. 18-13572

                                                                     Sean F. Cox
                                                                     United States District Court Judge

The Memorial Hospital,

    Defendant/ Counter- Plaintiff.
_____/


**OPINION & ORDER GRANTING**
**DEFENDANT/ COUNTER-PLAINTIFF'S MOTION FOR SUMMARY**
**JUDGMENT**

      This is a breach of contract case. Plaintiff/ Counter-Defendant, Emergency Professional Services, Inc. ("EPS") and Defendant/ Counter-Plaintiff, The Memorial Hospital d/b/a/ Memorial Healthcare ("Memorial") had a contract for professional emergency and hospitalist services. When the parties terminated the contract, EPS claimed Memorial owed it compensation due at the end of the contract term under the liquidated damages provision. (ECF No.1). Memorial filed a counter-claim for underpayment alleging that EPS had not fulfilled all of its post-termination obligations. (ECF No. 8). Memorial moved for summary judgment on its counter-claim, which is now before the Court. (ECF No. 14). The parties have briefed the issues and the Court heard oral argument on February 13, 2020. Because the terms of the contract are clear, the Court will GRANT Memorial's motion for summary judgment.

1

**BACKGROUND**

Under the terms of the contract, EPS was to provide Memorial with physicians and non-physician practitioners to serve Memorial's patients. In turn, Memorial was to compensate EPS according to the contract's compensation structure. The compensation structure required Memorial to provide EPS with a monthly "supplement", which helped EPS front costs. EPS received the supplement in addition to revenue it generated by performing its services at Memorial. The supplement was adjusted by monthly minimums and maximums set forth in the contract: if EPS's monthly revenue exceeded the contractual maximum, it had to credit Memorial the surplus; if the monthly revenue was less than the contractual minimum, Memorial had to pay EPS the difference.

In order to ensure each party was complying with the compensation structure, EPS would reconcile its accounts each month, and send Memorial a report of how much revenue it generated. In most months during the contract's term, EPS's monthly reconciliation resulted in a credit to Memorial. EPS was to either pay the credit via check, or Memorial was to offset the monthly supplement.

The parties terminated the agreement on the contract's third year anniversary. Now, the parties dispute the post-termination obligations, each claiming they have been underpaid.

**STANDARD OF DECISION**

Summary judgment will be granted when there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587

(1986). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## ANALYSIS

### A.

The issue on summary judgment is EPS's obligation to pay Memorial the amount EPS made in excess of the contractual maximum during the third year of the contract. The resolution of the dispute involves the following sections of the contract, set forth in Attachment 3-A. (See Ex. A, attached).

Section 1.2 of the contract required Memorial to pay EPS a monthly recurring revenue "supplement" of $58,565.08 per month, totaling $702,781.00 per year. *Id*. This supplement is in addition to the revenue EPS generated for its services.

The supplement is adjusted under Sections 1.4 and 1.5. *Id*. Section 1.4 provided EPS a guaranteed billable patient volume of 30,000 patients per year. In the event the actual number of billable patients was greater than 30,000, EPS was to credit Memorial against the following year's monthly supplements in the amount of $88.31 for every patient that exceeded the volume estimate. If the actual number of billable patients was less than the estimate, Memorial had to pay EPS an additional year-end subsidy equal to the difference between the actual volume of billable patients and the estimate, multiplied by $88.31. *Id*.

Similarly, Section 1.5 provided a floor amount ($98.06) and ceiling amount ($102.00) for net average patient collections. If patient collections exceeded that ceiling amount, EPS was to credit any collections over $102.00 per patient to Memorial against the future monthly

supplement payments. *Id*. If patient collections were less than the floor amount, Memorial had to pay EPS the difference between $94.00 and the net collections per patient multiplied by the actual volume of patients for the quarter. *Id*.

B.

Where the language of a writing is not ambiguous, its construction is a question of law for the court. *Dykema v. Muskegon Piston Ring Co.*, 348 Mich. 129 (1957). It is the duty of the court, not the jury, to define what is and what is not within the terms of a written contract. *Curbelo v. Macomb County Community College Trustees*, 38 Mich.App. 432, 435 (1972).

EPS argues Attachment 3-A did not survive termination. EPS points to the language of the contract which states "in the event the actual number of billable patients is greater than the [estimate], [EPS] shall credit [Memorial] against next year's annual supplement [.]" (Section 1.4, Ex. A). EPS argues that if the parties intended this provision to survive termination, they would not have required EPS to "credit" Memorial against "next year's" supplement. Rather, they would have required EPS to "pay" Memorial any amount owed. Now that they are not being paid a monthly supplement, EPS argues, there is no "credit" to be applied against such payment.

Memorial argues the contract's terms are clear—Sections 1.4 and 1.5 survive termination of the Agreement. By their terms, Sections 1.4 and 1.5 do not indicate whether they survive termination. Memorial argues that Section 6.6 governs the issue. That section reads, in relevant part:

> No termination of this Agreement shall affect (a) any rights or liabilities that arose or accrued prior to the date of termination or (b) any obligations that by their terms or nature must extend beyond the date of termination to be effective.

4

(Ex. A). Memorial says that reconciliation and crediting obligations survived termination because "[r]econciliation and credit relates to liabilities that accrued prior to termination (i.e., collections) which by their nature must extend beyond the date of termination because such reconciliations must be done to allow patient collections to fully mature." (ECF No. 15, PageID.102).

EPS disputes that the survival clause applies to Sections 1.4 and 1.5. It says there is nothing in those sections that, "by their terms or nature must extend beyond the date of termination to be effective." (Ex. A). Rather, EPS owned the accounts and collections from them. Now that EPS was not providing any services to Memorial, and Memorial is not paying EPS a supplement, "there is nothing to reconcile." (ECF No. 16, PageID.277).

C.

The contract terminated on April 30, 2018. Throughout the month of April, at least, EPS continued to process and reconcile payments received for patient accounts and calculate patient volume adjustments on a monthly basis. (ECF No. 15-8). On May 16, 2018, EPS emailed Memorial the April 2018 reconciliation report indicating that EPS owed Memorial money. (ECF No. 15-8). According to the report, EPS reconciled the patient volume for April 2018 when the accounts had not fully matured. In other words, EPS had not yet billed certain patients that EPS had served before the contract terminated. (ECF No. 19). Indeed, EPS admits it billed and collected for ER services to patients after termination. (ECF No. 19, Page ID.1189).

The termination of the contract does not release EPS from its obligation. The Court finds that Sections 1.2, 1.4, and 1.5 must survive termination of the contract under Section 6.6. Since there is a necessary gap between when EPS bills services and collects payment, the billing

5

sequence is an obligation that affects "rights or liabilities that arose or accrued prior to the date of termination and any obligations that by their terms or nature must extend beyond the date of termination to be effective." (Section 6.6, Ex. A). EPS must reconcile the net average patient collections until they fully mature and pay Memorial the full amount EPS collected in excess of the revenue it is entitled to.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Memorial's motion for summary judgment is GRANTED. The Court is scheduling a status conference on **March 24, 2020 at 2:30 p.m.**

Dated: February 27, 2020
s/Sean F. Cox
Sean F. Cox
U. S. District Judge

# Ex. A

Attachment 3-A, Section 1.2 provides:

> <u>Financial Supplement</u>. Facility shall pay Contractor an amount equal to $58,565.08 (the "Monthly Supplement") per month for a total of $702,781 per year (the "Annual Supplement") (ECF No. 16-11, PageID.811).

Attachment 3-A, Section 1.4 provides:

> <u>Volume Adjustments to Annual Supplement</u>. Facility has provided to Contractor [EPS] certain data indicating that the projected annual Department census of "Billable Patients" is 30,000 Billable Patients per year (the "Annual Volume Estimate") . . . . Within thirty (30) days following the end of each Contract Year, Contractor [EPS] shall determine the actual number of Billable Patients presenting to the Department during the prior Contract Year." In the event the actual number of Billable Patients is less than the Annual Volume Estimate, Facility shall pay Contractor an additional year-end subsidy equal to the difference between the actual volume during the Contract Year and the Annual Volume Estimate, multiplied by $88.31. In the event the actual number of Billable Patients is greater than the Annual Volume Estimate, Contractor shall credit Facility against the next year's Annual Supplement (and the corresponding Monthly Supplement payments), an amount equal to the amount by which the actual volume during the Contract Year exceeds the Annual Volume Estimate, multiplied by $88.31 (the estimated net average patient collection charge of $58.05 less billing fee of $9.75). (<u>Id</u>. at PaigeID.812).

Attachment 3-A Section 1.5 provides:

> <u>Net APC Reconciliation</u>. Based on the Annual Volume Estimate, Contractor [EPS] projects its net average patient collections each year to be approximately $98.06 per patient (the "Estimated Net APC"). Within thirty (30) days following each three (3) month period (each a "Quarter") commencing after the third (3rd) month of this Agreement's term. Contractor [EPS] shall reconcile the actual net average patient collections per patient ("Actual Net APC") against the Estimated Net APC for the applicable measuring Quarter. . . . In the event Contractor's [EPS] Actual Net APC per patient is greater than $102.00 per patient for a measured Quarter, Contractor [EPS] shall credit Facility's future Monthly Supplement payments in the amount by which the Actual Net APC exceeds the Annual Volume Estimate, multiplied by $88.31. (<u>Id</u>.)

Attachment 4, Section 6.6 provides:

> No termination of this Agreement shall affect (a) any rights of liabilities that arose or accrued prior to the date of termination or (b) any obligations that by their terms or nature must extend beyond the date of termination to be effective. (ECF No. 16-12, PageID. 856).